UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
UNITED STATES OF AMERICA,                      :
                                               :
                                               :          **OPINION AND ORDER**
               -against-                       :            09-CR-330 (DLI)
                                               :
                                               :
LUIS GARCIA,                                   :
                                               :
                            Defendant.         :
------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

By notice of motion dated August 3, 2010 and filed September 14, 2010, defendant Luis

Garcia moved for (i) dismissal of the indictment "due to an eight month delay in arraignment and

the filing of formal charges after an arrest, delay in the filing of an indictment, and substantial

deprivation of Defendant's liberty," (*see* FED. R. CRIM. P. 5(a); 18 U.S.C. §§ 3161(b), 3162(a),

3173), (ii) suppression of all statements made on February 14, 2008 and up until Defendant's

proffer with AUSA D'Alessandro, and all evidence received from the searches conducted on

February 14, 2008, "due to the fact that receipt of such evidence by law enforcement officials

violated the Defendant's rights," and (iii) a hearing regarding the above-referenced motions for

dismissal and suppression. The government opposed Defendant's motion. The court granted the

request for a hearing, which was held over a six-day period on November 29 and 30, 2010,

December 20, 2010, January 6, 2011[1] and February 11 and 24, 2011. Thereafter, the court

permitted the parties to submit additional briefs on the motion. For the reasons set forth below,

the remainder of Defendant's motion is denied.

---

[1] The transcript of the hearing held on January 6, 2011 incorrectly states that the date of the
hearing was January 13, 2011. Thus, the court considers any citations to the January 13, 2011
transcript in the parties' papers to be citations to the January 6, 2011 proceedings.

## BACKGROUND

The following witnesses testified for the government: U.S. Drug Enforcement Administration ("DEA") Special Agent ("SA") Michael Raczynsky, Nassau County Detective ("Det.") William Barry, DEA SA Joseph Catalano, Nassau County Detective Sergeant ("Sgt.") Pat Ryder, DEA Supervisory SA William Callahan and DEA Supervisory SA Aldo Rocco. Defendant testified on his own behalf. Only to the extent that Defendant's testimony is consistent with the testimony of the government's witnesses, does the court find Defendant's testimony to be credible. The court finds the testimony of the government's witnesses to be credible.

Defendant was arrested by Det. Barry in the Diamond District of Manhattan at approximately 11:00 A.M. on February 14, 2008, as part of an ongoing investigation of Lucho's Jewelry Corp. ("Lucho's").[2] (*See* 11/29/10 Tr.[3] at 19:15-20:21.) The investigation was conducted by DEA SA Raczynsky of the Organized Crime Drug Task Force Financial Investigation Team ("FIT"), and Sgt. Ryder was the supervising officer for the team that had been conducting surveillance at Lucho's prior to Defendant's arrest. (*See* 11/29/10 Tr. at 18:1-20:8.) Sgt. Ryder called for Defendant's arrest after a black bag that another individual obtained from Defendant earlier in the day was found to contain $200,000 in cash, which the agents subsequently seized. (11/29/10 Tr. at 57:24-60:20; 1/6/11 Tr. at 8:1-9:13.) At the time of Defendant's arrest, the DEA agents seized a box in Defendant's possession, which contained 17

---

[2] Lucho's is sometimes referred to in the parties' briefs and the hearing testimony as Defendant's business, and at other times as his wife's business. This distinction is not relevant to any arguments or claims made by the parties, and the business will be referred to as "Lucho's" herein.

[3] "Tr." will refer to the transcript of the six-day evidentiary hearing held in the instant case.

fine watches, and Defendant's wife's purse, which contained approximately $20,000. (*See* 11/30/10 Tr. at 224:21-225:6; Docket Entry No. 46 ("Mot."), Lawrence M. Herrmann Affirmation ("Herrmann Aff.") at 2 ¶¶ 2, 3.) SA Raczynsky, who joined the other federal agents and local law enforcement officers ("agents") shortly after the arrest, testified that this was a "summary arrest" and was not pursuant to a legal complaint or arrest warrant. (11/29/10 Tr. at 20:9-20:16.)

Approximately one hour after the arrest, Det. Barry and SA Raczynsky took Defendant, who was handcuffed during transport, to the 115th Precinct in Queens because they were having difficulty parking in the Diamond District and wanted to regroup, as well as obtain Defendant's consent to search his residence and Lucho's. (*Id.* at 22:1-23:9, 32:14-32:18.) The only exchange SA Raczynsky and Det. Barry had with Defendant on the drive to the 115th Precinct was to answer some of Defendant's questions regarding where they were going, and to ask Defendant if the contents of the box found on his person were his and where he was going with it. (*Id.* at 23:16-24:7.) Defendant told them, after they asked to whom the box belonged, that the money in the box was his, and it was from the sale of watches. (11/29/10 Tr. at 24:3-24:7; Mot. Ex. D at 1-2.) He also told them he was going to use the money to buy more watches he had selected from a show in Miami. (11/29/10 Tr. at 24:3-24:7; Mot. Ex. D at 1-2.) Defendant was not brought inside the 115th precinct, as the agents simply used the area outside the precinct to regroup.

SA Raczynsky testified that when they arrived at the 115th Precinct, he removed Defendant's handcuffs and read Defendant his *Miranda* warnings[4] "[v]erbally in English from a [*Miranda* Card]" in the presence of Det. Barry, while Defendant was still in the vehicle.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

(11/29/10 Tr. at 24:8-28:24, 32:14-33:16; 11/30/10 Tr. at 226:21-227:5; *see also* Gov't Ex. 3.) Defendant denies that the agents ever read him his rights. (1/6/11 Tr. at 126:1-126:7, 136:12-136:24.)

While questioning Defendant in the vehicle, the agents asked for his consent to search his residence, located at 59-60 56th Avenue, Apt. 2L, and Lucho's, located at 94-10 37th Avenue, both of which are in Queens County. (11/29/10 Tr. at 34:18-36:21.) SA Raczynsky testified that he believed this request for consent to search occurred after Defendant was read his *Miranda* rights. (*Id.* at 36:16-36:21.) SA Raczynsky testified that Defendant verbally gave consent for the agents to search both his residence and Lucho's, (11/29/10 Tr. at 34:22-36:21), and Defendant admitted that he consented, (2/11/11 Tr. at 86:19-87:2). Defendant was not handcuffed during either search, and he physically let the agents into both locations. (11/29/10 Tr. at 38:3-40:12, 43:5-43:13; 11/30/10 Tr. at 229:4-229:9; 1/6/11 Tr. at 14:7-14:24, 15:8-15:10, 126:10-126:19.) The search of his residence did not result in any seizures. Upon Defendant's request, after searching his residence, the agents picked up Defendant's daughter at school and then proceeded to Lucho's. (11/29/10 Tr. at 41:11-42:23.) After searching Lucho's, the agents seized the contents of the safe located in Lucho's, which included about $77,440.00. (*Id.* at 137:21-138:2; 1/6/11 Tr. at 16:5-16:25, 21:10-21:19.)

Defendant signed a *Miranda* waiver form and consent to search form for both his residence and Lucho's approximately one hour after his residence was searched, while Defendant and the agents were at Lucho's. (11/29/10 Tr. at 40:13-41:4; 44:18-48:6, 71:15-72:10; Herrmann Aff. at 2 ¶ 4; *see also* Gov't Exs. 1, 4.) Defendant claims that he could not actually understand the written consent form because it was in English, and he only signed the form "on the orders of an agent." (1/6/11 Tr. at 137:18-139:16; 2/24/11 Tr. at 11:25-12:24;

Herrmann Aff. at 2 ¶ 4; *see also id.* at 3 ¶ 17, 4 ¶ 18.)  Specifically, Defendant alleges that he was "told to sign a pile of papers in the lower left hand corner which the agent just turned up by the left lower corner of each page without showing [Defendant] or reading to [Defendant] what [he] was signing." (Mot. Ex. C at ¶ 7; *see also* 1/6/11 Tr. at 137:18-139:16; 2/24/11 Tr. at 11:25-12:24.)  Although Defendant initially declined to sign these forms, the agents allegedly told him it was just a formality, so he signed them.  (1/6/11 Tr. at 137:18-139:16; Mot. Ex. D at 2.)  SA Raczynsky disagreed with Defendant's characterization in that regard and stated that, if an agent had done so, he would have remembered it.  (11/29/10 Tr. at 62:3-62:20.)  SA Raczynsky testified that the English *Miranda* waiver form signed by Defendant at Lucho's had a Spanish translation of the warnings on the back, which was signed by Defendant after the agents returned to the DEA office.  (*Id.* at 48:24-50:2.)

Defendant claims that, after the searches were conducted, he was taken to the DEA office where he was processed, interrogated and instructed to sign more forms without any explanation or time to review them.  (1/6/11 Tr. at 151:18-152:4; Herrmann Aff. at 2 ¶ 8.)  Defendant was not handcuffed when he was interviewed at the DEA office.  (*See* 11/29/10 Tr. at 76:1-76:3; 11/30/10 Tr. at 199:23-199:25.)  Defendant claims he was told that if he did not cooperate, his wife, who was under arrest, would face federal charges and their children would be taken away from them.  (1/6/11 Tr. at 135:16-135:24; 2/11/11 Tr. 10:12-11:4, 16:12-22:8; Mot. Ex. D at 2; Herrmann Aff. at 2 ¶ 8.)  Defendant also claims that he was told at that time that he faced federal money laundering charges and that, if he cooperated, the agents would help him with his immigration status.  (11/29/10 Tr. at 123:9-124:3; 2/11/11 Tr. at 20:13-22:8, 28:25-29:2; Herrmann Aff. at 2 ¶ 9.)  SA Claudia Caballero was brought into the interview room because, "[a]t some point, [SA Raczynsky] asked [Defendant] if he would prefer to conduct the interview

in English or Spanish . . . . He said that . . . he preferred to do it in Spanish," so the agents brought SA Caballero to translate. (11/29/10 Tr. at 78:4-78:7; *see also id.* at 77:16-78:11; 79:22-80:17.) However, SA Caballero soon left the interview room because Defendant was not satisfied with her translation of his responses to SA Raczynsky's questions, and the interview proceeded in English. (*See* 11/29/10 Tr. at 88:8-89:8, 93:3-94:8, 149:5-149:22, 151:17-153:18; 11/30/10 Tr. at 204:5-205:1; 1/6/11 Tr. at 146:2-149:25.)

Defendant's wife and their two-year-old child were taken to the DEA office for processing, and his wife was questioned by the agents.[5] (11/29/10 Tr. at 76:11-77:7.) She was released after Defendant agreed to cooperate, and Defendant was released at approximately midnight on the same day. (11/29/10 Tr. at 103:11-104:18; 128:20-129:6.) SA Raczynsky testified that Defendant's agreement to testify and his wife's release were not related. (11/29/10 Tr. at 159:3-160:15.) SA Raczynsky also testified that Defendant signed a waiver of speedy arraignment form after he agreed to cooperate. (11/29/10 Tr. at 94:9-94:14; *see also* Gov't Ex. 2.)

Although Defendant initially cooperated with the DEA after February 14, 2008, Defendant's cooperation was terminated by the government at some time during the summer of 2008, because the government believed Defendant was not being truthful during the proffer sessions. (*See* 11/29/10 Tr. at 111:9-112:20, 174:3-175:24; *see also* Docket Entry No. 51 at 4.) An arrest warrant was obtained for Defendant on October 14, 2008 based on a complaint filed with this court. (*See* Docket Entry No. 1.) The government reported that "[D]efendant has

---

[5] Although Defendant's wife also submitted an affidavit describing what she alleges to be violations of her rights, (*see* Mot. Ex. E), Defendant's wife was not charged with any crime and is not included in the instant motion. Thus, unless her allegations support Defendant's claims regarding his own arrest and questioning, they will not be addressed herein.

sought to cooperate with other jurisdictions and has attempted to renew his cooperative

relationship with the United States Attorney's Office for the EDNY as recently as August 2010."

(Docket Entry No. 51 at 4.)

## DISCUSSION

I. **Violation of Speedy Trial**

Defendant alleges that, because he was arrested on February 14, 2008, he has been

deprived of his right to a speedy trial pursuant to 18 U.S.C. §§ 3161(b), 3162(a) and Federal

Rule of Criminal Procedure 5(a) even though no complaint had yet been filed, and, as he was not

arraigned until October 15, 2008.[6] (Herrmann Aff. at 1, 3 ¶ 16, 5 ¶ 25.) Accordingly, Defendant

argues that the indictment against him in this case must be dismissed or, alternatively, if the court

upholds the indictment, any statements made during Defendant's post-arrest interview on

February 14, 2008 until Defendant's proffer with AUSA D'Alessandro should be suppressed.[7]

_____

[6] Defendant also argues that, although he signed a waiver of a speedy arraignment, the waiver
was in English, so he was unable to read the document and he was not provided with a Spanish
translation prior to signing the document. (Herrmann Aff. at 5 ¶ 26.) However, obtaining this
waiver from Defendant was not necessary here, because the court finds that Defendant was not
arrested within the meaning of the Speedy Trial Act and, thus, the court need not determine
whether he was able to understand the form which was written in English. That said, the court
notes that, in addition to reviewing the written waiver, SA Raczynsky verbally explained the
purpose of the waiver of speedy arraignment to Defendant. (*See* 11/29/10 Tr. at 100:9-102:10
(SA Raczynsky explained to Defendant that waiving speedy arraignment ". . . would allow [you]
to work with us proactively, [you] would be waiving [your] right to go see a judge, and it would
allow [you] to then go out on the street and work with us practically . . .")); *see also infra* n.9.
As discussed further *infra* Section II.B(ii), the court finds that Defendant understood English
sufficiently enough to waive his rights.

[7] Notably, Defendant fails to specify which statements it wishes the court to suppress or whether
Defendant's request to suppress all statements made during the specified time period includes
any subsequent meetings with the DEA agents.

*A. Legal Standard*

Pursuant to 18 U.S.C. § 3161(b), "[a]ny information or indictment charging an individual with a commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." *See also* 18 U.S.C. § 3162(a) ("if, in the case of any individual against whom a complaint is filed charging such individual with an offense, no indictment or information is filed within the time limit required by Section 3161(b) . . . such charge against that individual contained in such complaint shall be dismissed or otherwise dropped."); FED. R. CRIM. P. 5(a) ("[a] person making an arrest . . . must take the defendant without unnecessary delay before a magistrate judge . . . ."). An "arrest" that triggers the Speedy Trial Act's timing provision requires the filing of a federal complaint and concurrently the deprivation of liberty for the purpose of facing charges. *United States v. Bloom*, 865 F. 2d 485, 490 (2d Cir. 1989); *see also United States v. Jones*, 129 F. 3d 718, 721-22 (2d Cir. 1997). Thus, when an individual is arrested but "promptly released from federal custody without the government filing formal charges, there is no 'arrest' within the meaning of 3161(b) . . . ." *Id*. The Second Circuit based this on the reasoning that "Congress did not intend every arrest in the course of ongoing criminal activity to force the government either to indict within thirty days or forfeit the right to prosecute." *Id*.

In order to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated, courts look to: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *Jones*, 129 F. 3d at 724. If the suspect makes any inculpatory statements during the period of unnecessary delay in bringing the suspect before a magistrate, they may be suppressed, however, delay alone does not require suppression. *See United States v. Perez*, 733 F. 2d 1026, 1031 (2d Cir. 1984); *United*

*States v. Markoneti*, 1993 WL 180355, at *1 (E.D.N.Y. May 25, 1993). An arrested person may waive his right to be brought before a magistrate judge without unnecessary delay. *Markoneti*, 1993 WL 180355 at *2.

### B. Analysis

Here, no complaint was filed against Defendant at the time he was taken into custody on February 14, 2008 and, after being detained for a reasonable amount of time to allow for the consent search of his residence and Lucho's, (*see infra* Section III), he was released without any pending charges based on his agreement to cooperate with the agents. (11/29/10 Tr. at 20:9-20:16, 109:11-110:6; *see also* Herrmann Aff. at 4 ¶ 24, 5 ¶ 25); *see Bloom*, 865 F. 2d at 490 ("[N]either the government nor defendants would benefit from a rule that might create incentives to prosecute cases that would otherwise be dropped or from a rule that would compel an indictment before the value of [defendants'] cooperation was apparent."). Although the agents took Defendant's passport as an act of good faith toward his cooperation with the DEA, no other restraints on his liberty were imposed other than asking him to "stick around" that week. (11/29/10 Tr. at 109:1-109:11; 129:12-129:23.) Those actions are not sufficient to constitute a restraint for purposes of the Speedy Trial Act, because they were done in connection with Defendant's cooperation, not in connection with the filing of a complaint or for purposes of Defendant facing federal charges. *See Bloom*, 865 F. 2d at 491 (finding no deprivation of liberty triggering the Speedy Trial Act's timing provisions where the defendant's return trip home was delayed, his communications concerning the investigation were limited, and he was interrogated upon his return home, because these restrictions "were not in connection with the filing of the complaint or for purposes of [the defendant] facing charges").

Furthermore, although "no formal complaint was filed on Feb. 14, 2008," (*see* Herrmann Aff.. at 4 ¶ 24), and Defendant testified that, at the time, he was confident no charges could be filed against him, (*see* 2/11/11 Tr. at 18:16-18:25), Defendant argues that "until the application for the current warrant leading to the arrest of October 14, 2008, he believed he was facing federal charges during the intervening period." (Herrmann Aff. at 4 ¶ 24; *see also* 2/11/11 Tr. at 19:9-19:13, 29:21-29:2; 2/24/11 Tr. at 7:8-8:3.) A proffer session Defendant had with the assigned prosecutor, allegedly further supported his belief that federal charges were in fact pending against him. (Herrmann at 4 ¶¶ 19, 20.) However, Defendant's belief that he would be arrested does not mean that he was under arrest for purposes of the Speedy Trial Act, or that his brief detention otherwise violated his rights.[8] *See United States v. Janick*, 723 F. 2d 537, 542 (7th Cir. 1983) ("[t]he Speedy Trial act does not protect the man whose peace of mind is disturbed because, though he is not under arrest or out on bail and no charge has been lodged against him, he is likely to be charged.").

Defendant's argument that he was coerced to cooperate because he was concerned, among other things, about potential future charges, that his wife was in custody, and that his children might be taken away, is similarly without merit. (*See* 1/6/11 Tr. at 135:16-135:24; 2/11/11 Tr. at 10:12-11:4, 16:12-22:8; Mot. Ex. D at 2; *see also* Herrmann Aff. at 3 ¶ 10 (Defendant alleges that he only agreed to cooperate "[i]n the face of . . . coercive threats and in light of reassuring promises about his pending immigration status, a promise to return the seized

---

[8] Defendant relies on *United States v. DiGregorio*, 795 F. Supp. 630 (S.D.N.Y. 1992), to support his assertion that cooperation is not voluntary where the defendant was told or at least believed that charges had been filed against them. However, while the court in *DiGergorio* does note that "perhaps more significant than the actual filing of charges is the defendant's subjective belief that charges have been brought and are pending," it did not find that the Speedy Trial Act was violated, but rather ordered an evidentiary hearing to determine whether the defendant's rights were in fact violated. *Id.* at 638.

money and eventual favorable case resolution without incarceration.").) SA Raczynsky testified that, at no time during their interaction on February 14, 2008, did he threaten to take away Defendant's children or deport Defendant, or otherwise threaten Defendant, if he did not cooperate or sign any of the waivers. (11/29/10 Tr. at 102:7-103:1; 104:11-108:2.) The mere fact that SA Raczynsky told Defendant, if both he and his wife were incarcerated, then his children would have to be turned over to a responsible adult or Administration for Children's Services, does not constitute coercion. (*See* 11/29/10 Tr. at 105:2-105:17); *see United States v. Alvarado*, 882 F. 2d 645, 649-50 (2d Cir. 1989), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137 (1995) (agent's statements that the defendant had a daughter and it would be in her best interest to cooperate, cooperation would be brought to the judge's attention, and failure to cooperate could subject her to a ten-year prison sentence, did not render the confession involuntary); *cf. Lynumn v. Illinois*, 372 U.S. 528, 533-34 (1963) (finding a confession to be coerced where law enforcement told the defendant who had never been arrested before that, if she did not cooperate, state financial aid for her children would be cut off and her children would be taken away from her). Moreover, merely telling Defendant that it wouldn't be wise to discuss the cooperation with his neighbor does not constitute coercion. (*See* 11/29/10 Tr. at 110:7-110:25.)

SA Raczynsky testified that Defendant was cooperative throughout their interaction on February 14, 2008 and he became even more cooperative after speaking with the agents with whom he had worked in the past when he was a confidential source for the DEA. (*See* 11/29/10 Tr. at 82:20-84:4.) Defendant cooperated with the DEA for approximately five months, until the summer of 2008 when DEA agents determined that Defendant was not being truthful. (*See* 11/29/10 Tr. at 111:9-112:20, 174:3-175:24; 1/6/11 Tr. at 55:10-55:14.) Moreover, Defendant

had a history of cooperating with the government for over twenty years and, thus, he understood the process and requirements, as well as the consequences, of cooperating. (*See* 2/11/11 Tr. at 51:4-64:12.) Consequently, the court finds that there was no coercion, and Defendant voluntarily cooperated with the agents.

In sum, Defendant's rights pursuant to the Speedy Trial Act were not violated, because there was no arrest within the meaning of the Speedy Trial Act and any pre-indictment delay was reasonable. Accordingly, Defendant's motion to dismiss the indictment based on a violation of the Speedy Trial Act is denied.

Furthermore, Defendant was not denied his Sixth Amendment right to a speedy trial. *See* 18 U.S.C. § 3173 ("No provision of [the Speedy Trial Act] shall be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution."). "As with [Defendant]'s Speedy Trial Act claim, the key Sixth Amendment issue is whether [Defendant] was either arrested or subjected to substantial restrictions for purposes of answering a criminal charge." *Bloom*, 865 F. 2d at 491; *see also United States v. Marion*, 404 U.S. 307, 320 (1971) ("it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."). For the reasons stated above, the court finds that he was not and, thus, his Sixth Amendment rights were not violated.

## II.    Waiver of Defendant's *Miranda* Rights

Defendant argues that he was not read his rights and, even if he was, he did not knowingly, intelligently or voluntarily waive those rights. Accordingly, Defendant moves to suppress "[a]ll statements [made by Defendant] subsequent to his arrest on Feb. 14, 2008 until the proffer with AUSA D'Allessandro, when Defendant had counsel present and  . . . [had] a

Spanish language interpreter . . . , both on grounds of coercive conduct prior to his release at 2:00 A.M. on February 15, 2008 and [a failure by Defendant to properly waive his rights] due to Defendant's lack of proficiency and fluency in English, particularly in the reading and writing of the English language." (Herrmann Aff. at 6 ¶ 2; *see also* 1/6/11 Tr. at 135:16-135:24, 139:4-139:7; 2/11/11 Tr. at 10:12-11:4, 15:23-22:8; 33:17-33:18, 84:9-85:8; 2/24 Tr. at 11:25-12:1.) Defendant further contends that, even if *Miranda* warnings were given outside the 115th precinct and while in Lucho's, the failure to properly renew the warnings at the DEA Office requires suppression of Defendant's statements because the agents had consistently told Defendant throughout the day that he must not speak to a lawyer if he wanted to cooperate with them.

   A.  *Legal Standard*

When moving to suppress post-arrest statements by challenging their voluntariness, a defendant must specify the factual basis upon which to sustain the motion.  *See United States v. Mathurin*, 148 F. 3d 68, 69 (2d Cir. 1998).  Once the defendant provides the factual basis, the government bears the burden of proving, by a preponderance of the evidence, that a defendant was advised of his constitutional rights guaranteed under *Miranda* and that he knowingly, intelligently and voluntarily waived those rights.  *See Lego v. Twomey*, 404 U.S. 477, 489 (1972); *United States v. Anderson*, 929 F. 2d 96, 99 (2d Cir. 1991).  To meet its burden, the government must show that it is more likely than not that a defendant was given his *Miranda* warnings and that he properly waived those rights.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328-29 (2007).  If the government does not meet this burden, then it may not use any statements obtained from a defendant that were the product of custodial interrogation. *See Miranda*, 384 U.S. at 444-45.

The court must look to the totality of the circumstances to determine whether the accused's confession is voluntary, *i.e.*, "whether the government agents' conduct was such to overbear a defendant's will to resist and bring about confessions not freely self-determined." *United States v. Kaba*, 999 F. 2d 47, 51 (2d Cir. 1993) (citations and internal quotation marks omitted). "The factors to be considered include the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *Alvarado*, 882 F. 2d at 649 (citations and internal quotation marks omitted). A language barrier is another factor the court should consider when determining the validity of a waiver. *See United States v. Heredia-Fernandez*, 756 F. 2d 1412, 1415 (9th Cir. 1985) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.") A statement is not voluntary if it is obtained by "techniques and methods offensive to due process or under circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (citations and internal quotation marks omitted); *see also Anderson*, 929 F. 2d at 99.

Furthermore, *Miranda* warnings given in the midst of "coordinated and continuing interrogation" will not cure a prior unwarned confession, because "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them," which is the purpose of administering the *Miranda* warnings. *Missouri v. Seibert*, 542 U.S. 600, 612-14 (2004) (citations and internal quotation marks omitted). "The threshold issue when interrogators question first and warn later is thus

whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 611-12.

    B. *Analysis*

        i.   <u>*Miranda* Warnings Given to Defendant</u>

Defendant argues that he was not given proper *Miranda* warnings by the agents, which he contends is evidenced by his own testimony, as well as the inconsistencies in the agents' testimony regarding when and how Defendant was allegedly read his rights. (*See* 1/6/11 Tr. at 126:1-126:9, 136:12-136:24; Docket Entry No. 63 at 5-6.) However, despite some inconsistencies in the agents' testimony regarding how Defendant was read his rights and who was present at that time, the court finds that the evidence and testimony provided at the hearing show that it is more likely than not that Defendant was given proper verbal *Miranda* warnings. Furthermore, Defendant admitted to signing forms waiving his *Miranda* rights, both in English during the search of Lucho's,[9] (1/6/11 Tr. at 157:12-158:10; *see also* 11/29/10 Tr. at 44:18-47:8; Gov't Ex. 1A), and in Spanish while at the DEA office, (1/6/11 Tr. at 157:12-158:10; *see also* 11/29/10 Tr. at 48:24-50:2; Gov't Ex. 1B).

SA Raczynsky testified that he read Defendant his *Miranda* rights "[v]erbally in English from a [*Miranda* Card]" in the presence of Det. Barry, while Defendant was in the vehicle outside the 115th precinct. (11/29/11 Tr. at 24:8-28:24, 32:14-33:16; *see also* Gov't Ex. 3.) In addition, Sgt. Ryder testified that, when he pulled up to the 115th precinct, Det. Barry and SA

---

[9] Although there is conflicting evidence on the record regarding whether Defendant's ability to read English is sufficient to knowingly and intelligently waive his rights pursuant to the English written waiver, (*compare* 11/29/10 Tr. at 48:7-48:18 (SA Raczynsky's testimony that Defendant read other documents in English such as invoices, which include descriptions of items and addresses, during the course of his business) *and* 2/11/11 Tr. at 84:9-84:12 (Defendant's testimony that "I don't know how to read English. I understand street English and I speak some English . . . but I don't read English"), the court need not make that determination because it finds that Defendant properly waived his rights pursuant to the prior verbal waiver.

Raczynsky were in the vehicle talking to Defendant, at which time Sgt. Ryder stuck his head into the vehicle and heard SA Raczynsky read the entire *Miranda* warnings to Defendant. (1/6/11 Tr. at 12:3-13:2, 36:25-38:13.) Sgt. Ryder testified that Defendant said in response to SA Raczynsky's warnings, that "I don't need an attorney. I'm legitimate." (1/6/11 Tr. at 12:3-12:9.)

Defendant argues that the government fails to meet its burden because of inconsistencies in the agents' testimony regarding when the agents read Defendant his *Miranda* rights and who was present at that time. However, that the agents do not remember the exact details of the events that took place in the vehicle does not make their testimony contradictory. For example, although Det. Barry testified that he did not recall being present while SA Raczynsky was reading Defendant his rights and, instead, that he was merely "informed by [SA] Reczynsky [sic] that [SA Raczynsky] read [Defendant] his *Miranda* warnings . . . ," (11/30/10 Tr. at 228:6-228:9; 265:8-265:15), he did recall that SA Raczynsky and Defendant were having a conversation while he was in the car. (*See* 11/30/10 Tr. at 261:6-263:2 ("They were in conversation, your Honor, I just don't recall exactly what the conversation was [and] . . . I don't have any notes of the incident. I didn't prepare any paper work on the incident . . . .") Also, while SA Raczynsky failed to state during his testimony that Sgt. Ryder was present when he read Defendant his *Miranda* rights, that does not discredit the rest of his testimony or the testimony provided by Sgt. Ryder regarding the administration of Defendant's *Miranda* rights. (*See* 1/6/11 Tr. at 36:25-38:13.) Thus, while the agents' testimony does not corroborate every detail of the encounter, the court finds the testimony of the agents to be credible and does not find the testimony to be

contradictory on any material issues. Accordingly, the court finds that it is more likely than not that Defendant was read his *Miranda* rights in the vehicle at the 115th precinct.[10]

ii.   <u>Knowing, Intelligent and Voluntary Waiver by Defendant</u>

Defendant further argues that, even if he was read his *Miranda* rights, he did not knowingly, intelligently and voluntarily waive his rights because: (i) Defendant does not have a sufficient understanding of English to waive his rights pursuant to verbal or written *Miranda* warnings given in English; (ii) the additional statements made to Defendant by the agents make it unreasonable for the court to find that the warnings given could function effectively pursuant to *Seibert*; (iii) he was told to sign the Spanish form without the agents allowing him to properly review the form or have it explained to him; and (iv) he was coerced.

First, the court rejects Defendant's argument that he does not have a sufficient understanding of English to waive his rights pursuant to verbal *Miranda* warnings. Although SA Aldo Rocco testified that he used a Spanish interpreter when the agents had Defendant participate in an undercover operation in case there was a nuance he could not convey to Defendant in English, (1/6/11 Tr. at 78:19-79:13, 95:15-22), SAs Raczynsky, Rocco, Callahan and Catalano, as well as Det. Barry and Sgt. Ryder, all testified that: (i) they engaged in lengthy discussions with Defendant in English, during which Defendant never asked for an interpreter; (ii) Defendant appeared to understand and responded as if he understood; and (iii) Defendant gave the agents no indication that he did not understand what they were saying, (*see* 11/29/10 Tr. 52:9-53:1; 53:16-55:6; 72:1-72:25, 93:3-94:8; 11/30/10 Tr. at 226:10-226:18, 236:1-236:5;

---

[10] Furthermore, although Defendant testified that he was never read his *Miranda* rights on February 14, 2008 or in connection with his prior arrests, he knows what "*Miranda* rights [are] because of the movies" and he "know[s] that they're supposed to give them to you." (1/6/11 Tr. at 165:25-167:15.) Defendant is not a novice to the criminal justice system, a factor the court can consider in determining whether or not a *Miranda* waiver is knowing. *See United States v. Scarpa*, 897 F.2d 63, 69 (2d Cir. 1990).

12/20/10 Tr. at 14:19-16:9; 1/6/11 Tr. at 10:14-10:16, 54:16-57:8, 67:8-67:18, 73:20-75:21, 83:1-84:13, 85:21-86:13.) In particular, SA Raczynsky testified that he read Defendant his rights in English and provided Defendant with the written waiver form in English, because they had been conversing in English during their entire interaction on February 14, 2008, and Defendant appeared to understand what was being said to him and was appropriately responsive. (11/29/10 Tr. at 28:18-30:23, 51:8-53:1.)

Prior to his interview at the DEA office, Defendant did not indicate that he did not understand any law enforcement officer, or ask for an interpreter. (*See* 11/29/10 Tr. at 28:18-30:23, 52:9-53:1, 72:1-72:25; 11/30/10 Tr. at 226:10-226:18, 236:1-236:5; *see also* 11/29/10 Tr. at 78:3-78:11.) Notably, while SA Caballero was translating the interview at the DEA office for Defendant, Defendant interrupted her several times because he disagreed with her translations, thereby showing his nuanced understanding of the English language. (*See* 11/29/10 Tr. at 88:8-89:8; 11/30/11 Tr. at 204:5-204:9; 1/6/11 Tr. at 146:2-149:25.) SA Raczynsky testified that, after Defendant insisted on continuing the interview at the DEA office in English, he and Defendant communicated well in English, and, when Defendant did not understand something, he would inform the agents and they would rephrase the question. (11/29/10 Tr. at 93:3-94:8.) The court also observed first-hand Defendant's clear understanding of English, when he immediately answered questions in English at the hearing before this court instead of allowing the official court interpreter to first translate the questions into Spanish. (*See e.g.* 1/6/11 Tr. at 106:7-107:9, 150:5-151:14; 2/11/11 Tr. at 25:7-25:15.) Thus, the court finds that Defendant's understanding of the English language was sufficient for him to understand the *Miranda* rights that were verbally read to him, and knowingly and intelligently waive those rights. Accordingly,

the court need not address whether Defendant was able to read the English waiver of rights form. *See supra* n.9.

Second, Defendant contends that, even if the agents gave proper *Miranda* warnings to Defendant in the vehicle outside the 115th precinct, and again through the written English waiver form provided to Defendant during the search of Lucho's, the statements made by Sgt. Ryder and SA Raczynsky throughout the day directing Defendant not to get an attorney caused the warnings to be ineffective pursuant to *Missouri v. Seibert*, 542 U.S. 600 (2004). (*See* 1/6/11 Tr. at 135:16-136:11 (Defendant alleging the agents told him "no lawyer" and "no friends.").)

Although SA Raczynsky did not read Defendant his *Miranda* rights until they arrived at the 115th precinct, the testimony shows that the only substantive exchange the agents had with Defendant on that drive was to answer Defendant's questions regarding where they were going, and ask Defendant if the contents of the box found on his person were his and where he was going with it. (11/29/10 Tr. at 23:16-24:7.) Furthermore, the testimony of the agents shows that they never instructed Defendant not to get an attorney, and the court credits the testimony of the agents over that of Defendant. (*See id.* at 110:22-110:25, 145:23-146:8.) Also, Defendant's own testimony indicates that Defendant understood he had a right to an attorney and knew how to go about hiring one. (*See* 2/11/11 Tr. at 40:14-45:13 (Defendant had hired an attorney a month after his arrest to have the money seized from Lucho's returned to him); 1/6/11 Tr. at 163:21-165:13 (Defendant had an attorney when he was arrested in 1995).) Therefore, unlike the warnings provided in *Seibert*, it is reasonable to find that the warnings provided to Defendant in the instant case could function effectively and the agents' initial verbal warnings were not rendered ineffective throughout Defendant's time in custody on February 14, 2008. *See Seibert*, 542 U.S.

at 611-12 ("The threshold issue . . . [is] whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires.").

The court also rejects Defendant's argument that the agents did not properly administer Defendant's *Miranda* rights to Defendant again while at the DEA office. While at the DEA office, Defendant signed a Spanish Statement of Rights waiver form. (*See* Gov't Ex. 1B.) Defendant argues that the form was invalid because SA Caballero who allegedly reviewed the form with Defendant failed to sign it, and that he only signed the Spanish waiver form later in the evening at the precinct without reading the form or obtaining any explanation of what he was signing from the agents. SA Caballero's failure to sign and date the Spanish waiver of rights form, while sloppy law enforcement procedure, does not mean that Defendant was not properly informed of his *Miranda* rights, and that he knowingly, intelligently and voluntarily waived those rights. The court credits SA Caballero's testimony, which establishes that SA Caballero showed the waiver form to Defendant, in Spanish offered to read the form, watched Defendant review and sign the form, and asked Defendant in Spanish whether he understood the form, to which Defendant responded that he did. (11/30/10 Tr. at 200:1-202:9, 207:20-209:3.) SA Caballero's testimony and the Spanish waiver form admittedly signed by Defendant, especially in combination with the *Miranda* warnings administered earlier in the day, show by a preponderance of the evidence, that Defendant's rights were explained to him in full and he knowingly and intelligently waived those rights.

Finally, Defendant argues that he was coerced and pressured to waive his Miranda rights and, thus, he did not waive his rights voluntarily. No evidence has been presented to show that the agents coerced Defendant to waive his *Miranda* rights and cooperate. As discussed above, (*see supra* Discussion Section I.B.), even if the agents told Defendant that his wife was under

arrest and that if both Defendant and his wife were incarcerated then Defendant's children might have to be cared for by the city, it would not constitute coercion. Furthermore, the court credits the agents' testimony that they did not threaten or in any other way force Defendant to waive his *Miranda* rights. (*See* 11/29/10 Tr. at 33:4-33:23, 50:19-51:5, 106:4-108:5, 126:9-127:1; 1/6/11 Tr. at 53:20-54:3.)

Therefore, based on the evidence and testimony provided, the court finds that the government has established by a preponderance of evidence that, prior to Defendant's confession, Defendant was advised of his constitutional rights as guaranteed by *Miranda* and that he knowingly, intelligently and voluntarily waived his rights. Accordingly, Defendant's motion to suppress any statements on that basis is denied.

## III.  Suppression of Physical Evidence

Defendant also argues that any physical evidence seized from his residence or Lucho's should be suppressed because "written consent to search his house and [Lucho's] in Queens was obtained only after both searches were conducted." (Herrmann Aff. at 1, 2 ¶ 4.) Although it was unclear during the hearing whether Defendant is in fact challenging the consent to search, (*see* 11/29/10 Tr. at 34:5-34:17), in an abundance of caution, the court will address the issue herein.

### A.  Standard of Law

Voluntary consent for a search from an individual who is authorized to give it, properly waives a person's Fourth Amendment right against an unreasonable search and seizure. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliot*, 50 F. 3d 180, 185 (2d Cir. 1995). The court must determine whether the waiver was voluntary based on the totality of the circumstances. *See United States v. Yu-Leung*, 51 F. 3d 1116, 1119 (2d Cir. 1995). Valid consent can be granted verbally. *See United States v. Grant*, 375 F. App'x 79, 80-81 (2d Cir.

2010) (holding search was valid based on the defendant's verbal consent despite concerns about the validity of a written consent to search).

### B. Analysis

In the instant case, the defendant admittedly brought the agents, and granted them access, to his residence and Lucho's. (*See* 1/6/11 Tr. at 11:19-12:17 (when Sgt. Ryder advised Defendant that they were going to apply for search warrants for both Lucho's and his residence, Defendant advised Sgt. Ryder "that [the agents] can search them [because] he has nothing to hide, he's a legitimate businessman."); Mot. Ex. D at 2 (Defendant alleges that the agents "told [him] that if [he] had nothing to hide then [he] wouldn't mind [allowing] them to go to [Lucho's] and . . . to search it to make sure that there were no drugs. [Defendant] told them that [he] do[es]n't do those things. Then they said well show it to us and also show us [Defendant's] apartment. So [Defendant took them to [his] apartment and they searched it well."); *id.* at 2 ("When [Defendant] got [to Lucho's he] opened the doors . . . [he] opened the safe.").) In addition, SA Raczynsky testified that Defendant verbally gave consent for the agents to search his residence and used a key to let the agents into his residence. (11/29/10 Tr. at 38:3-40:12; 11/30/10 Tr. at 228:21-229:21.) SA Raczynsky and Det. Barry both testified that Defendant was not handcuffed when they entered Defendant's residence, and he was allowed to be present during the search. (11/29/10 Tr. at 38:5-38:13, 39:24-40:1; 11/30/10 Tr. at 229:4-229:21) Further, the evidence revealed that Defendant turned off the alarm system at Lucho's, willingly opened the safe and was not handcuffed during the search. (11/29/10 Tr. at 43:5-44:17; 11/30/10 Tr. at 230:22-230:25; 1/6/11 Tr. at 16:5-16:25, 35:6-35:21.) Accordingly, even if the consent form was invalid because it was executed after the searches were conducted or because Defendant's ability to read English was not sufficient, the evidence and testimony shows that

Defendant verbally consented to the searches. Consequently, the court need not address whether the consent to search forms were properly executed.

## **<u>CONCLUSION</u>**

For the aforementioned reasons, Defendant's motion is denied in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
        November 30, 2011

_____
                /s/
        DORA L. IRIZARRY
    United States District Judge